UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Matthew Saumweber and<br>Amy Saumweber,<br><br>Plaintiffs,<br><br>v.<br><br>Green Tree Servicing, LLC,<br><br>Defendant. | Case No. 13-cv-03628 (SRN/SER)<br><br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Patrick L. Hayes and William C. Michelson, Marso and Michelson, P.A., 3101 Irving Avenue South, Minneapolis, MN 55408, for Plaintiffs.

Matthew R. Brodin, Briggs and Morgan, P.A., 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I. INTRODUCTION

This matter is before the Court on Defendant Green Tree Servicing, LLC's Motion for Summary Judgment [Doc. No. 22]. For the reasons stated below, the Court grants Defendant's Motion.

## II. BACKGROUND

Plaintiffs Matthew and Amy Saumweber took out a mortgage loan with America's Wholesale Lender ("AWL")[1] on March 4, 2005, for the purchase of residential property.

---

[1]   Plaintiff refers to Countrywide Home Loans throughout its Complaint, however, it appears that Countrywide Home Loans and AWL refer to the same entity. (See Hajost Aff. [Doc. No. 26], Ex. 1.) The Court will refer to that entity as AWL, which is the name

(See Hajost Aff. [Doc. No. 26], Exs. 1 & 2.)  Mortgage Electronic Registration Systems, Inc. ("MERS") was AWL's nominee and the legal mortgagee in the transaction, while AWL held the note.  (See id., Exs. 1 & 2.)  On May 21, 2008, Plaintiffs' personal obligations on the note were discharged in Chapter 7 bankruptcy proceedings.  (Compl. [Doc. No. 1] ¶¶ 11, 14.)  Plaintiffs claim that AWL received notice of the discharge on May 22, 2008.  (Id. ¶ 15.)  Although Plaintiffs did not reaffirm their debt to AWL after the debt was discharged, (id. ¶ 16), they did voluntarily continue to make monthly payments on the mortgage, (see Hajost Aff., Ex. 3).

On November 1, 2011, Defendant took over the servicing of Plaintiffs' mortgage. (Id., Ex. 4.)[2]  When Plaintiffs failed to make timely mortgage payments in August and September 2012, (see id., Ex. 3), Defendant sent them a letter notifying them of their default on the mortgage, their right to cure the default, and the effect of failing to cure the default, (id., Ex. 5).  Plaintiffs assert that they also received numerous phone calls from Defendant during August and September 2012, that they repeatedly informed the callers that the debt had been discharged, and that they asked that Defendant stop calling.  (Compl. ¶¶ 20–22.) On October 1, 2012, Defendant sent an additional letter to Plaintiffs that explained various credit counseling options, including the possibility of participating in the Home Affordable Modification Program ("HAMP").  (Hajost Aff., Ex. 6.)  The letter stated, "TO RECEIVE HELP WITH YOUR MORTGAGE, YOU MUST ACT BY: 10/31/2012."  (Id.)

---

used in the mortgage and note documents.  (See id., Exs. 1 & 2.)

[2]     This document explains that the servicing of Plaintiffs' loan was transferred to Defendant from Bank of America.  Defendant states in its brief that Bank of America was the successor to AWL, and Plaintiffs do not dispute this point.

On October 16, 2012, MERS assigned the mortgage to Defendant. (Id., Ex. 7.) On January 4, 2013, Defendant requested a "soft pull" of Plaintiffs' credit reports for purposes of evaluating their eligibility for the Fannie Mae loan modification program. (Id. ¶ 6; Brodin Aff. [Doc. No. 25], Exs. A & B.) The credit reports explain that this type of account review inquiry is not seen by anyone and is not used in calculating an individual's credit score. (Brodin Aff. [Doc. No. 25], Exs. A & B.) That same day, Defendant sent Plaintiffs a letter notifying them that, while they did not qualify for the HAMP, they were eligible for the Fannie Mae loan modification program. (Hajost Aff., Ex. 8.) The letter informed Plaintiffs that they had to make three trial period payments—the first was due on February 1, 2013; the second on March 1, 2013; and the third on April 1, 2013. (Id.)

Plaintiffs did not respond to the loan modification offer, and, around January 22, 2013, Defendant commenced a foreclosure by advertisement with a sale date of March 14, 2013. (See id., Ex. 9.) Plaintiffs elected to postpone the foreclosure sale for five months in exchange for a shortened redemption period, pursuant to Minnesota Statutes § 580.07. (Id., Ex. 10.) They notified Defendant on February 19 that they wanted to negotiate a short sale and, by June 28, 2013 had sold their home at a price that allowed them to pay off the mortgage in full. (See id., Exs. 11 & 12.)

Plaintiffs filed this lawsuit against Defendant on December 26, 2013, alleging that Defendant violated the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and Plaintiffs' right to privacy by accessing Plaintiffs' credit reports without a permissible purpose. (Compl. ¶¶ 1, 25, 30, 37, 45.) Plaintiffs claim that, as a result of Defendant's conduct, they suffered "humiliation, anger, anxiety, emotional distress, fear, frustration, and

3

embarrassment," as well as "stress and loss of sleep." (Id. ¶¶ 31, 39.) They also claim to have incurred out-of-pocket expenses. (Id. ¶ 32.) Plaintiffs further assert that Defendant's conduct was willful and malicious and, therefore, Plaintiffs seek punitive damages in addition to actual, compensatory, and statutory damages, and attorneys' fees and costs. (Id. ¶¶ 31–33, 38–40, 46; id. at 9.) Defendant filed its Motion for Summary Judgment on February 20, 2015, and the matter was heard on April 3.

## III.  DISCUSSION

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322–23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. Anderson, 477 U.S. at 248. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Although the party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed, Celotex Corp., 477 U.S. at 323, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is

a genuine issue for trial," Anderson, 477 U.S. at 256. Thus, the movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. No genuine issue of material fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Defendant argues that summary judgment is appropriate on each of Plaintiffs' claims because, due to the "continuing credit relationship" between the parties, Defendant was within its rights in requesting Plaintiffs' credit reports. (Mem. in Supp. of Def.'s Mot. for Summ. J. [Doc. No. 24] ("Def.'s Mem.") at 2.) The Court agrees.

### A.   Count I:  Fair Debt Collection Practices Act

Defendant seeks summary judgment as to Plaintiffs' Fair Debt Collection Practices Act claim asserted in Count I of their Complaint on the grounds that Defendant is not a "debt collector" subject to the Act. (Def.'s Mem. at 21.) Defendant also argues that summary judgment is proper because the only conduct falling within the applicable one-year statute of limitations (i.e., the "soft pull" of Plaintiffs' credit reports) is not an unfair practice prohibited by the Act. (Id. at 22.) Plaintiffs did not address this portion of Defendant's Motion and, at the hearing on this matter, stated that they were abandoning the claim. Therefore, Count I is dismissed.

### B.   Count II:  Fair Credit Reporting Act

Summary judgment is also warranted on Count II, Plaintiffs' Fair Credit Reporting Act ("FCRA") claim. The FCRA was enacted "'to ensure fair and accurate credit

reporting, promote efficiency in the banking system, and protect consumer privacy.'" Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir. 2008) (quoting Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007)). Accordingly, the FCRA prohibits an entity from using or obtaining an individual's credit report unless it is used or obtained for a permissible purpose, and the FCRA imposes civil liability for both willful and negligent violations. See 15 U.S.C. §§ 1681b(f), 1681n, 1681o. While willful violators are liable for actual or statutory damages, negligent violators are liable only for actual damages. Id. §§ 1681n, 1681o.

Defendant argues that Plaintiffs' claim fails because—contrary to Plaintiffs' allegations—Defendant had a permissible purpose to request their credit reports, Plaintiffs cannot establish that any alleged violation was willful, and there is no evidence of actual damages. (See Def.'s Mem. at 8–21.)

**1. Permissible purpose**

Under the FCRA, an entity has a permissible purpose for accessing a credit report if it:

(A)  intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

. . .

(F)  otherwise has a legitimate business need for the information—

. . .

    (ii)  to review an account to determine whether the consumer continues to meet the terms of the account.

6

Id. § 1681b(a)(3). "Whether a permissible purpose existed is a question of law." Breese v. TRIADvantage Credit Servs., Inc., 393 F. Supp. 2d 819, 821 (D. Minn. 2005).

Here, Plaintiffs contend that Defendant lacked a permissible purpose to request their credit reports because the debt had been discharged in bankruptcy and, accordingly, no credit relationship existed between the parties. (Pls.' Mem. in Opp. to Def.'s Mot. for Summ. J. [Doc. No. 29] ("Pls.' Opp.") at 5–9.) Plaintiffs rely on Godby v. Wells Fargo Bank, N.A., 599 F. Supp. 2d 934 (S.D. Ohio 2008), and Barton v. Ocwen Loan Servicing, LLC, Civ. No. 12-162 (MJD/JJG), 2013 WL 5781324 (D. Minn. Oct. 25, 2013), to support their argument. In addition, Plaintiffs assert that Defendant did not have a valid reason to access their credit reports because they did not request an evaluation of their eligibility to participate in a loan modification program. (See Pls.' Opp. at 6.)

Defendant, relying heavily on Germain v. Bank of America, N.A., No. 13-cv-676-bbc, 2014 WL 5802018 (W.D. Wis. Nov. 7, 2014), argues that, although Plaintiffs' personal obligations on the note were discharged in bankruptcy, the obligations under the mortgage remained. (Def.'s Mem. at 8–12.) Therefore, Defendant asserts, a credit relationship existed and Plaintiffs' account was not closed. (See id.) In fact, Defendant points out, Plaintiffs continued to make monthly mortgage payments into that account.[3] (Id. at 8.)

---

[3] Defendant also argues that the FCRA does not require consumer consent in order for a credit review to be permissible. (See Reply Mem. in Supp. of Def.'s Mot. for Summ. J. [Doc. No. 32] at 5.) However, there does seem to be some support for the proposition that Plaintiffs' consent was required for an inquiry made pursuant to 15 U.S.C. § 1681b(a)(3)(A):

7

The Court agrees with Defendant and with the reasoning of the district court in Germain. As that court noted:

> After a chapter 7 discharge, the consumer is not personally liable for the loan, but he or she still "owes" the lender in the form of the property (the collateral). 11 U.S.C. §§ 726–27. In other words, the consumer must either make new arrangements with the lender to keep the property, return it to the lender or wait for it to be foreclosed upon. Thus, until the borrower fulfills his debt, he has a credit relationship in the form of an obligation to the lender, even after discharge.

Germain, 2014 WL 5802018, at *5. Therefore, as to a plaintiff whose mortgage was discharged in Chapter 7 bankruptcy proceedings but who retained possession of his home, the court concluded:

> Because Germain remained in possession of his property, he remained responsible to make payments or face foreclosure. Either option posed risks to defendant: in the first instance, Germain might be unable to make his payments; and, in the second instance, foreclosure involved costs and potential losses for defendant. Because Germain still held an obligation to defendant from the credit that defendant had extended to him, . . . a credit relationship and "account" existed between them. Therefore, it was permissible under the Fair Credit Reporting Act for defendant to obtain Germain's consumer report to review his account. §§ 1681b(a)(3)(A), (F).

---

> A consumer reporting agency may furnish a consumer report relating to any consumer pursuant to subparagraph (A) or (C) of subsection (a)(3) of this section in connection with any credit or insurance transaction <u>that is not initiated by the consumer</u> only if—
>
> (A) <u>the consumer authorizes the agency to provide such report</u> to such person; or
>
> (B) [other conditions exist that are not discussed in the present Motion].

15 U.S.C. § 1681b(c)(1) (emphases added). Given Defendant's alternative reliance on § 1681b(a)(3)(F), the Court need not resolve this issue.

8

Id. at *7. The court also found that the defendant's review of the plaintiff's credit report for purposes of determining whether he qualified for a loan modification program was a "permissible purpose" under the FCRA because "[l]oan modification involves an agreement between the parties on alternative terms for the borrower to fulfill his preexisting obligation to the lender." Id.

Similarly, Plaintiffs in this case were relieved of their personal liability under the mortgage loan when the loan was discharged in the bankruptcy proceedings, but they remained in possession of their home. Thus, they had an obligation to Defendant to make payments on the mortgage, even after the bankruptcy proceedings were concluded, or face foreclosure. And, in fact, they continued to make payments for several years. Accordingly, an account—and a credit relationship between the parties—existed for purposes of the FCRA. In addition, when Plaintiffs stopped making timely payments in August 2012, it was permissible under the FCRA for Defendant to obtain their credit reports for purposes of reviewing their account and evaluating their eligibility for a loan modification program to provide alternative terms for Plaintiffs to fulfill their obligations to Defendant.

The cases cited by Plaintiffs do not mandate a contrary result. For example, in Godby, the plaintiff sued the defendant based on a "soft pull" of her credit information made after her mortgage loan with the defendant had been discharged in Chapter 7 bankruptcy proceedings. 599 F. Supp. 2d at 935–36. Although the court determined that there was no account in place as of the date the defendant obtained the credit score and,

therefore, that the defendant did not have a permissible purpose in accessing the score, id. at 938, the court reasoned that:

> There is nothing in the record indicating that the account review was obtained to either provide a benefit to Plaintiff or to collect a pre-existing debt. Notwithstanding Plaintiff's name on the title to the property, as a practical matter, the parties did not have an existing relationship. Plaintiff had surrendered her rights to the property. . . .

Id. at 942 (emphases added). Here, on the contrary, Plaintiffs remained in their home and continued to make monthly mortgage payments, and Defendant sought to offer them a benefit in the form of a loan modification program. And, although the court in Barton found that no credit relationship would exist between a defendant servicing a plaintiff's mortgage and the plaintiff if the mortgage loan was discharged in bankruptcy, 2013 WL 5781324, at *4, the court "did not explore the ramifications of . . . [the plaintiff's] continuing possession of the mortgaged property," Germain, 2014 WL 5802018, at *7. Here, Plaintiffs' continued possession of their home and voluntary payments on their mortgage account demonstrate that a credit relationship existed. For these reasons, the Court finds that Defendant did not violate the FCRA when it accessed Plaintiffs' credit reports.

### 2. Lack of willfulness and damages

Even if there were an issue of fact as to whether the access of Plaintiffs' credit reports was made for a permissible purpose, Plaintiffs have presented no evidence of willfulness or actual damages. "'To show willful noncompliance with the FCRA, [the plaintiff] must show that [the defendant] knowingly and intentionally committed an act in conscious disregard for the rights of others, but need not show malice or evil motive.'"

10

Bakker v. McKinnon, 152 F.3d 1007, 1013 (8th Cir. 1998) (citation and internal quotation marks omitted).  Reckless conduct is sufficient to establish willfulness under the FCRA and includes actions that involve "an unjustifiably high risk of harm that is either known or so obvious that it should be known."  Safeco Ins. Co. of Am., 551 U.S. at 68 (citations and internal quotation marks omitted).  Where a party acts on an interpretation of the FCRA that is founded in the statutory text, and there is no contrary guidance from the Federal Trade Commission or courts of appeals, the party's actions are not objectively unreasonable and, therefore, do not involve an unjustifiably high risk of harm.  Id. at 69–70.  "'[S]o long as a user has reason to believe that a permissible purpose exists, that user may obtain a consumer report without violating the FCRA.'"  Miller v. Rubin & Rothman, LLC, Civ. No. 10–2198 (MJD/JJK), 2011 WL 4359977, at *3 (D. Minn. Sept. 19, 2011) (quoting Korotki v. Attorney Servs. Corp., 931 F. Supp. 1269, 1276 (D. Md. 1996)).

The FCRA does not explicitly address whether an "account" must be "open" in order for an entity to permissibly access the accountholder's credit report.  And, the only FTC or court of appeals authorities identified by the parties demonstrate that Defendant's reading of the FCRA was reasonable.  For example, Plaintiffs cite to two advisory opinions issued by the FTC (Advisory Opinion to Gowen (04-29-99) and Advisory Opinion to Benner (04-30-99)) for the proposition that accessing a consumer's credit report in the present circumstances "requires an 'open or current' account."  (Pls.' Opp. at 11.)  However, in each opinion, the FTC defines a "closed" account as one where the account or debt has been paid off.  (See id., Ex. 1 (Advisory Opinion to Gowen (04-29-

11

99) at 2 ("[R]eview of an account under Section 604(a)(3) refers to an existing (i.e., open or current) account.  A creditor has no existing business relationship with consumers whose closed end credit accounts have been paid off, i.e., former borrowers.")); id., Ex. 2 (Advisory Opinion to Benner (04-30-99) at 1 ("Once an account is closed because the consumer has paid the debt in full . . . , it is our view that no permissible purpose exists for a [consumer reporting agency] to provide file information on a consumer to the creditor.")).)  Here, as discussed above, Plaintiffs' mortgage still existed, and they continued to make voluntary monthly payments on that mortgage account.  Accordingly, Defendant's belief that Plaintiffs' account remained open was not unreasonable.

Defendant, for its part, cites to an Eleventh Circuit opinion in which the court concluded that interpreting the FCRA to permit the sale of a consumer report to a creditor after the consumer has closed his account with the creditor is not objectively unreasonable.  Levine v. World Fin. Network Nat'l Bank, 554 F.3d 1314, 1318–19 (11th Cir. 2009).  Notably, this opinion was issued several years after the advisory opinions discussed above, and the court stated that there was no authoritative guidance on the issue.  Id.  Thus, even if Plaintiffs' mortgage account with Defendant had been closed in the bankruptcy proceedings, Defendant's reading of the FCRA was not unreasonable but rather, as Plaintiffs' counsel noted multiple times at the hearing on this matter, was a mere "technical" violation.  As such, Defendant's conduct did not involve an unjustifiably high risk of harm to Plaintiffs.

Absent evidence of willfulness, any alleged violation in this case was, at most, negligent.  In order to maintain a claim for negligent noncompliance under the FCRA, a

plaintiff must show actual damages.  See 15 U.S.C. § 1681o(a)(1); Taylor v. Tenant Tracker, Inc., 710 F.3d 824, 827–28 (8th Cir.2013) (affirming summary judgment for the defendant because the plaintiff presented insufficient evidence of actual damages to support her claim for negligent noncompliance with the FCRA).  While emotional distress damages can constitute actual damages under the FCRA, such damages "must be supported by competent evidence of 'genuine injury,' which 'may be evidenced by one's conduct and observed by others.'"  Taylor, 710 F.3d at 828 (quoting Carey v. Piphus, 435 U.S. 247, 264 n. 20 (1978)).  A "brief episode of frustration and unhappiness" is insufficient.  Id. at 829 (finding that a plaintiff's own testimony that she was upset and embarrassed, even when corroborated by a third party's testimony that the plaintiff cried, "[did] not establish the sort of concrete emotional distress that is required to constitute a genuine injury and actual damages" under the FCRA).

     Plaintiffs' Complaint states that they have incurred out-of-pocket expenses and have suffered humiliation, anger, anxiety, emotional distress, fear, frustration, embarrassment, stress, and loss of sleep.  However, Plaintiffs have failed to substantiate their claim of out-of-pocket expenses with any evidentiary support.  Moreover, while an emotional distress injury may be established solely by a plaintiff's own testimony, the evidence presented here does not show the type of concrete emotional distress that is required to demonstrate a genuine injury and actual damages sufficient to survive summary judgment.  In fact, the only information provided in response to interrogatories requesting a description of the factual basis for these alleged damages was a statement that emotional distress damages are "difficult to quantify."  (Brodin Aff., Ex. C (Resp. to

13

Interrogs. No. 8, 10).) And, Plaintiffs' affidavits in opposition to summary judgment merely repeat the allegations in the Complaint. For example, Plaintiffs state that they "felt harassed" and experienced "stress which [led] to disagreements and arguments," Matthew Saumweber states that his "sleep was impacted" because he was "filled with anxiety and fear," Amy Saumweber states that she was "fearful" that Defendant would contact her at her place of business and "experienced anxiety and had difficulty concentrating," and Plaintiffs state that they each noticed the anxiety experienced by the other. (M. Saumweber Aff. [Doc. No. 30] ¶¶ 4–7); A. Saumweber Aff. [Doc. No. 31] ¶¶ 4–5, 7–9.) There is no evidence that Plaintiffs suffered any physical injury related to their emotional distress or that they were treated for their emotional distress. Rather, these conclusory claims show only a "brief episode of frustration and unhappiness" and are insufficient to support a FCRA claim. Accordingly, summary judgment is warranted as to Count II.

### C. Count III: Invasion of Privacy by Intrusion Upon Seclusion

Finally, Defendant seeks dismissal of Count III of Plaintiffs' Complaint, which asserts a common law invasion-of-privacy claim for intrusion upon seclusion. As a threshold matter, the Court notes that Plaintiffs have failed to address that portion of Defendant's Motion. While the Court could dismiss Count III on this basis, it will briefly address Plaintiffs' claim on the merits.

Under Minnesota law, "[i]ntrusion upon seclusion occurs when one 'intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person.'" Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231, 233 (Minn. 1998) (quoting Restatement

(Second) of Torts § 652B (1977)). "The tort has three elements: (a) an intrusion; (b) that is highly offensive; and (c) into some matter in which a person has a legitimate expectation of privacy." Swarthout v. Mut. Serv. Life Ins. Co., 632 N.W.2d 741, 744 (Minn. Ct. App. 2001). "In the context of intrusion upon seclusion, questions about the reasonable person standard are ordinarily questions of fact, . . . but they become questions of law if reasonable persons can draw only one conclusion from the evidence." Id. at 745 (citation and internal quotation marks omitted).

Plaintiffs must meet a high threshold of offensiveness and expectation of privacy to have a viable claim for intrusion upon seclusion. See, e.g., Lake, 582 N.W.2d at 235 (stating that "[o]ne's naked body is . . . generally known to others only by choice" and "is a type of privacy interest worthy of protection"); Swarthout, 632 N.W.2d at 745 (finding that use of an altered medical information release form to obtain and publicize private medical information may be highly offensive). "Simply accessing another's credit report in good faith . . . does not typically give rise to an intrusion upon seclusion claim." Eaton v. Cent. Portfolio Control, Inc., Civ. No. 14-747 (DSD/FLN), 2014 WL 6982807, at *3 (D. Minn. Dec. 9, 2014). Nor does "[t]he use of improper methods to obtain information, such as a request that violates the [FCRA], . . . necessarily make the acquisition of information highly offensive, if the information could just as well have been obtained by proper means." Phillips v. Grendahl, 312 F.3d 357, 373 (8th Cir. 2002), abrogated on other grounds by Safeco Ins. Co. Am., 551 U.S. at 56.

As noted above, Plaintiffs neglected to address this claim in their summary judgment briefing. Thus, the only pieces of evidence before the Court in support of

15

Plaintiffs' claim are the verified allegations in the Complaint.  However, Plaintiffs' assertions that Defendant's "illegal attempts to collect this debt . . . occurred in a way that would be highly offensive to a reasonable person," and that they "had a reasonable expectation of privacy in [their] solitude, seclusion, and private concerns or affairs," are insufficient to create a genuine issue of material fact.  (Compl. ¶¶ 44–45.)  Not only has the Court found that Defendant's access of the credit reports was not illegal, but Plaintiffs have not demonstrated that the handful of letters and phone calls they received were "highly offensive" or identified any piece of accessed information that was sufficiently private to warrant protection and to which Defendant did not otherwise have access.  Accordingly, Defendant is entitled to summary judgment on Count III because Plaintiffs have presented no evidence from which a reasonable jury could conclude that Defendant's access of Plaintiffs' credit reports was "highly offensive" or that Plaintiffs had a "legitimate expectation of privacy" in the accessed information.

## IV.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1.   Defendant's Motion for Summary Judgment [Doc. No. 22] is **GRANTED**; and

2.   Plaintiffs' Complaint [Doc. No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  May 19, 2015                    s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Judge